COURT OF APPEALS
EIGHTH DISTRICT OF TEXAS
EL PASO, TEXAS



| | | |
|---|---|---|
| A GUARDIAN ANGEL CHILD CARE CENTER, INC., | § | No. 08-20-00024-CV |
| Appellant, | § | Appeal from the |
| v. | § | 34th District Court |
| MARCOS RIOS, | § | of El Paso County, Texas |
| Appellee. | § | (TC# 2013DCV1462) |

# **O P I N I O N**

This appeal arises from a final judgment awarding personal injury damages to the Appellee, Marcos Rios, after a jury trial. Rios sued his former employer, Appellant, A Guardian Angel Child Care Center, Inc., for negligence after he was exposed to fire extinguisher fumes while on the job. In the days following his exposure, Rios began experiencing shortness of breath and a tightness in his throat. Approximately a week after exposure, his condition deteriorated to respiratory failure and eventually required a permanent tracheostomy. Rios sought personal injury damages for past medical expenses, past and future pain and suffering and mental anguish, and past and future disfigurement, among other damages. The jury awarded the full amount of past medical expenses sought, in addition to damages for mental anguish, disfigurement, lost earnings, and lost earning capacity.

Guardian seeks reversal of the trial court's judgment, arguing the evidence adduced at trial by Rios regarding causation, which consisted solely of lay testimony, was legally insufficient to support the jury's findings on proximate cause and the amounts awarded for past medical damages.

We find the evidence legally insufficient to support the jury's finding the fire extinguisher incident caused all the medical expenses the jury awarded to Rios. We must, therefore, reverse the judgment of the trial court. However, because there is evidence to support some damages—specifically, damages for respiratory illness treated between January 28, 2013 and February 28, 2013—we remand the case to the trial court for new trial.

## BACKGROUND

Rios drove a van as an employee of Guardian. His job primarily involved transporting children to and from Guardian's daycare facility.

On January 28, 2013, Rios arrived for his shift and was instructed to pick up two children at their schools and take them back to Guardian's facility. He asked his girlfriend, an off-duty employee of Guardian, to accompany him while he drove. She agreed and sat in the passenger seat. Shortly after picking up the two children, Rios heard a hissing noise and saw white-yellowish powder coming from the passenger side of the van. Rios pulled the van over to the side of the road while rolling down the windows. Once safely pulled over, Rios and his girlfriend got the children out of the van and left the doors open so the powder could clear out. They then got back into the van and drove the children to the daycare. The parties later realized the powder came from a fire extinguisher located under the passenger seat of the van. However, the parties disagree on how the powder escaped from the fire extinguisher.

In the days following the incident, Rios began experiencing a scratchy throat and some

2

shortness of breath. After initially receiving treatment at the hospital for swelling in his throat and shortness of breath three days after the incident, Rios was discharged. However, later the same day, Rios returned to the emergency room with shortness of breath which, within a few hours, required intubation. After a week in the hospital, Rios was discharged a second time. However, only three days after his second discharge, Rios was admitted for a third hospital stay for shortness of breath and diagnosed with respiratory failure and received a permanent tracheostomy. During his second and third hospital stays, Rios was also diagnosed with and treated for multiple chronic health conditions involving obesity, type-two diabetes mellitus, and obstructive sleep apnea, as well as other non-respiratory, non-chronic conditions.

Rios sued Guardian for negligence alleging they failed: (1) to properly secure the fire extinguisher in the vehicle; (2) to train their employees on use of the fire extinguisher; (3) to provide a safe workplace. These failures allowed the fire extinguisher to leak and ultimately caused Rios's damages.

At trial, the only testimony regarding damages or causation came from Rios. Most of that testimony was Rios's reported experience of the accident, his symptoms in the days immediately following the incident, the conditions he experienced during his hospital admissions, and the treatment he received from his physicians. He also offered his medical records and medical bills into evidence, which were admitted over Guardian's objections to causation.

Rios testified that the day following the incident he began experiencing "a soreness or an itchiness in the nostrils and the throat area" and went to the hospital at approximately 11:30 p.m. on January 31, 2013. He stated he went to the emergency room because he was having irritation in his throat and difficulty breathing. Medical records state, "Patient complaining of difficulty

3

breathing and swelling to throat area onset two days ago after inhaling powder from a fire extinguisher." He recalled reporting that information to medical providers at that time. His records state, "Impression and plan. Chemical exposure and pneumonitis. Reactive airway exacerbation." During the initial emergency room visit, Rios testified he received oxygen therapy. Upon discharge on February 1, 2013, he received educational materials on asthma, acute bronchospasm, and inhalation injury.

Rios testified after he was discharged from his first hospital visit the morning of February 1, 2013, he returned to the emergency room the same day at approximately 8:00 p.m. complaining of shortness of breath. The medical records from the second visit state, "[Rios] said that five days ago he inhaled powder from a fire extinguisher in his car." The medical records note Rios was experiencing "[i]nspiratory and expiratory wheez[ing]" as well as thick yellow phlegm. The records also state, "Patient states he feels throat swelling and difficulty speaking." On February 2, 2013, he was intubated, and his medical records indicate at the time of intubation Rios was experiencing, "[r]espiratory distress, airway protection[.]" The records went on to state, "[P]atient with inhalation injury five days ago with progressively worsening dyspnea and laryngeal edema." Rios was discharged from his second hospital visit on February 8, 2013, a week after he was admitted. His discharge diagnosis was asthma exacerbation, morbid obesity, and diabetes mellitus type 2. At trial, he testified he had asthma as a child and sometimes used an inhaler. He denied ever going to the hospital for asthma as an adult before the incident occurred. At discharge, he received a prescription for metformin to treat his diabetes, and other medications whose purpose was unknown to Rios.

On February 11, 2013, Rios was admitted to the hospital. The notes from this visit state

4

"Chief complaint[:] Complains of shortness of breath with sudden onset at [10:00 p.m.]. Patient with diminished [breath sounds] to upper lobes bilaterally, denies pain. Patient was discharged from ICU February 8, 2013." A second note entered a short time later indicates, "[Age] 29 morbidly obese male with stridor complains of shortness of breath, recurrent, was recently intubated at UMCEP for similar episode. Related to inhaling fire retardant. Denies exposure today. Exam. Obese inspiratory and stridor."

Rios's records from February 12, 2013 contain a note from a pulmonologist, which states, "Patient examined by me. I agree with findings above[.] Dyspnea, dysphonia, morbid obesity. . . . Not asthma." Rios recalls telling his medical team during the third visit about the incident with the fire extinguisher. Rios's medical records show he underwent a tracheostomy on February 13, 2013. The surgical notes state, "Preoperative diagnosis: Respiratory failure. Postoperative diagnosis: Respiratory failure. Procedure performed: Open complex tracheostomy. . . . Findings of procedure: It was a simple, converted to complex open trach."

Rios was discharged from his third hospital visit on February 28, 2013. In his medical records, his discharge diagnosis is, "1. Upper airway obstruction second to vocal cord dysfunction S/P permanent tracheostomy placement. 2. [Obstructive sleep apnea]. 3. Morbid obesity. 4. UTI. 5. H/O childhood asthma. 6. DM2." Rios's third hospital stay discharge summary reflects: his course of treatment to include intubation and a course of tracheostomy, a failed BiPAP and twice-failed extubation, a permanent tracheostomy placement, and a laryngoscopy with an "[e]ssentially normal pharynx and epiglottis." The records also state, "During this hospitalization, the patient reports sweating, chills, fever, and urine culture was positive for Klebsiella pneumoniae sensitive to Zosyn. It was treated and was resolved after 7 days." Discharge medications included metformin

5

for diabetes and albuterol as well as tracheostomy supplies and other equipment to keep the tracheostomy tube clean.

Rios testified that after his third visit to the hospital, he had a follow-up visit with a pulmonologist, Dr. Hughes. He did not describe or elaborate on the treatment he received from Dr. Hughes. He testified he had another follow up with a different pulmonologist, Dr. Figueroa, in 2017 but did not give any testimony about the follow-up appointment. The medical records from the two pulmonologist visits list problems of body mass index between 60.0-69.9, obesity, congestive heart failure, obstructive sleep apnea, respiratory failure from obesity hypoventilation syndrome, and asthma, with the earliest onset date of some conditions listed as February 27, 2017. The records do not mention exposure to chemical fumes. Rios removed his own tracheostomy in October of 2015 because it was causing him difficulty breathing at work.

Rios offered four sets of medical bills and affidavits, which were admitted over Guardian's objection. The billing records for University Medical Center included charges for the three hospital admissions following the incident; several outpatient visits for hypertension in 2013, 2014, and 2015; and one outpatient visit for chronic respiratory failure in May of 2013. The billing records for the hospital admissions list the services rendered, but do not state what condition the services provided treatment for. Only the billing records from the first hospital visit state a diagnosis, which reads "TOXIC EFF OTH GAS/VAPOR." The two subsequent hospital admission billing statements do not list any diagnoses or specify what conditions were treated by the services rendered. They list myriad prescriptions and drugs administered, therapy, lab procedures, respiratory therapies, and other charges. The total amount of outstanding expenses from University Medical Center for the hospital visits and the outpatient appointments was $131,910.35. Rios's

6

other billing records showed $84 owed to Texas Tech Physicians for the three hospital admissions and two outpatient visits, and $991.66 owed to Major Medical Supply for medical supplies from February 28, 2013 through February 28, 2014. There were also billing records from a clinic, Salud y Vida, which showed no remaining amount owed after insurance payments and adjustments.

Rios also offered, and the trial court admitted over Guardian's objection, a medical billing summary. In closing argument, Rios's counsel referenced the summary, which listed $132,986.01 as the amount Rios owed his healthcare providers for treatment received as a result of the incident. Rios's counsel urged the jury to write that figure in the amount of past medical expenses awarded if the jury found Guardian negligent.

At the close of evidence, Guardian moved for directed verdict, arguing Rios offered no evidence to prove the conditions Rios suffered from were caused by the fire extinguisher incident. Guardian argued the types of injuries claimed by Rios required a medical expert to prove causation. The trial court denied Guardian's motion for directed verdict on causation.

The jury found Guardian's negligence proximately caused Rios's injuries and awarded $132,986.01 for Rios's past incurred medical expenses, plus awards for physical pain and mental anguish in the past and future, loss of earning capacity in the past, disfigurement, and past and future physical impairment. The trial court entered judgment for Rios in accordance with the jury's findings. Post-judgment, Guardian filed a motion for judgment notwithstanding the verdict on the same causation grounds raised in its motion for directed verdict, and a motion for new trial. Neither motion was ruled upon and were overruled by operation of law. *See* TEX.R.CIV.P. 329b. This appeal followed.

**DISCUSSION**

7

Guardian presents two issues on appeal. The first is whether expert medical testimony was required to establish proximate cause of Rios's injuries from inhalation of the fire extinguisher fumes. The second is whether expert medical testimony was required to establish which medical expenses awarded to Rios by the jury were attributable to the incident with the fire extinguisher. We consider the issues in the order Guardian presented them.

### *Standard of Review*

This appeal involves questions of legal sufficiency: whether the evidence in a personal injury case was legally sufficient to prove proximate cause and damages absent testimony from a medical expert.

A legal sufficiency or "no evidence" challenge will only be sustained on appeal if the record demonstrates: (1) the complete absence of a vital fact; (2) the court is barred by rules of law or evidence from giving weight to the only evidence offered to prove a vital fact; (3) the evidence offered to prove a vital fact is no more than a scintilla; or (4) the evidence establishes conclusively the opposite of the vital fact. *City of Keller v. Wilson*, 168 S.W.3d 802, 810 (Tex. 2005); *Dallas Nat. Ins. Co. v. Morales*, 394 S.W.3d 826, 831 (Tex.App.—El Paso 2012, no pet.). When conducting a legal sufficiency review, we consider the evidence in the light most favorable to the verdict, crediting favorable evidence if a reasonable juror could, and disregarding contrary evidence unless a reasonable juror could not. *City of Keller*, 168 S.W.3d at 810; *Region XIX Service Center v. Banda*, 343 S.W.3d 480, 484 (Tex.App.—El Paso 2011, pet. denied). "[A]n appellate court conducting a legal sufficiency review cannot 'disregard undisputed evidence that allows of only one logical inference.'" *City of Keller*, 168 S.W.3d at 814 (quoting *St. Joseph Hosp. v. Wolff*, 94 S.W.3d 513, 519-20 (Tex. 2002)). The final test for legal sufficiency must always be whether

8

the evidence at trial would enable reasonable and fair-minded people to reach the verdict under review. *City of Keller*, 168 S.W.3d at 827.

In conducting our legal sufficiency review, we are mindful that the jury, as fact finder, was the sole judge of the credibility of the witnesses and the weight to be given their testimony. *City of Keller*, 168 S.W.3d at 819. We may not substitute our judgment for the fact finder's, even if we would reach a different answer on the evidence. *See Golden Eagle Archery, Inc. v. Jackson*, 116 S.W.3d 757, 761 (Tex. 2003).

### *Applicable Law*

As with each of the elements in a personal injury case, proving causation "requires a plaintiff to 'prove that the conduct of the defendant caused an event and that this event caused the plaintiff to suffer compensable injuries.'" *JLG Trucking, LLC v. Garza*, 466 S.W.3d 157, 162 (Tex. 2015)(citing *Burroughs Wellcome Co. v. Crye*, 907 S.W.2d 497, 499 (Tex. 1995)). The plaintiff must prove "both 'what all the conditions were' that generated the [medical] expenses and 'that all the conditions were caused by the [incident].'" *Id.* (quoting *Guevara v. Ferrer*, 247 S.W.3d 662, 669 (Tex. 2007)).

"The general rule has long been that expert testimony is necessary to establish causation as to medical conditions outside the common knowledge and experience of jurors." *Guevara*, 247 S.W.3d at 665. "[E]xpert medical evidence is required to prove causation unless competent evidence supports a finding that the conditions in question, the causal relationship between the conditions and the accident, and the necessity of the particular medical treatments for the conditions are within the common knowledge and experience of laypersons." *Id.* at 663. "Evidence of an event followed closely by manifestation of or treatment for conditions which did not appear

before the event raises suspicion that the event at issue caused the conditions." *Id.* at 668. "But suspicion has not been and is not legally sufficient to support a finding of legal causation." *Id.* "When evidence is so weak as to do no more than create a surmise or suspicion of the matter to be proved, the evidence is 'no more than a scintilla and, in legal effect, is no evidence.'" *Id.* (quoting *Ford Motor Co. v. Ridgway*, 135 S.W.3d 598, 601 (Tex. 2004)).

"Nevertheless, when combined with other causation evidence, evidence that conditions exhibited themselves or were diagnosed shortly after an event may be probative in determining causation." *Guevara*, 247 S.W.3d at 668. When lay testimony "establish[es] a sequence of events which provides a strong, logically traceable connection between the event and the condition[s]" and the physical conditions complained of "(1) are within the common knowledge and experience of laypersons, (2) did not exist before the [incident], (3) appeared after and close in time to the [incident], and (4) are within the common knowledge and experience of laypersons, caused by [the incident,]" then such lay testimony alone "could suffice to support a causation finding[.]" *Id.* at 667. "Thus, non-expert evidence alone is sufficient to support a finding of causation in limited circumstances where both the occurrence and conditions complained of are such that the general experience and common sense of laypersons are sufficient to evaluate the conditions and whether they were probably caused by the occurrence." *Id.* at 668–69 (*citing Burroughs Wellcome Co.*, 907 S.W.2d at 499).

### Issue One: Lay Testimony to Support Causation

Guardian, relying chiefly on *Guevara*, urges us to find expert medical testimony was required for Rios to prove causation to the jury. It claims because Rios's physicians diagnosed him with several conditions which Rios concedes are unrelated to the incident at the same time he was

allegedly being treated for shortness of breath associated with inhalation of the fire extinguisher fumes, lay testimony was insufficient to differentiate between conditions which were attributable to the incident, if any, and those which were not. Additionally, Guardian argues Rios's pre-existing conditions require the testimony of an expert medical witness to establish whether the shortness of breath experienced by Rios in the days following the incident can be attributed to the incident, or something else.

Rios, however, directs us to *Morgan v. Compugraphic Corp.*, 675 S.W.2d 729 (Tex. 1984) and *Guevara*'s affirmance of *Morgan*'s holding "[l]ay testimony is adequate to prove causation in those cases in which general experience and common sense will enable a layman to determine, with reasonable probability, the causal relationship between the event and the condition." *Id.* at 733 ("Generally, lay testimony establishing a sequence of events which provides a strong, logically traceable connection between the event and the condition is sufficient proof of causation."); *Guevara*, 247 S.W.3d at 666.

Based on the framework presented in *Guevara*, we must determine first whether the testimony provided by Rios on causation "establish[ed] a sequence of events which provides a strong, logically traceable connection between the event and the condition[s]." *Guevara*, 247 S.W.3d at 667. If we answer affirmatively, we must then determine whether the physical conditions complained of "(1) are within the common knowledge and experience of laypersons, (2) did not exist before the [incident], (3) appeared after and close in time to the [incident], and (4) are[,] within the common knowledge and experience of laypersons, caused by [the incident]." *Id.* In conducting this analysis, we are mindful of the standard of review and our duty to consider the evidence in the light most favorable to the verdict, crediting favorable evidence if a reasonable

11

juror could, and disregarding contrary evidence unless a reasonable juror could not. *City of Keller*, 168 S.W.3d at 810; *Region XIX Serv. Ctr.*, 343 S.W.3d at 484.

If both prongs of the *Guevara* framework are met, the absence of expert medical testimony on causation is not per se legally insufficient. *Guevara*, 247 S.W.3d at 667. If, however, we determine either part of the *Guevara* inquiry has not been established, then Rios would have been required to put on competent testimony from a medical expert to prove causation. *Id.* The absence of expert testimony under those circumstances would render the lay testimony legally insufficient to support causation. *See id.*

### A Sequence of Events Providing a Strong, Logically Traceable Connection Between the Event and the Condition

#### The Event

In his description of the incident, Rios states he was driving Guardian's van when he heard a hissing sound. At the same time he heard the sound, he saw "white-yellowish powder" coming from the passenger side of the van. The powder was drifting up by the passenger door to the top of the van and going toward the driver's side. He and his girlfriend, who was in the passenger seat, almost immediately began to roll down their windows and he began trying to pull over. Rios believed he inhaled some of the powder through his nose and mouth. He could not recall how long the powder was coming out of the fire extinguisher, but he testified "it all happened pretty quick." He testified about the time they rolled the windows down, the powder had stopped coming out. While he was pulling the van over, Rios testified he could still see through the powder to safely pull the van over. After Rios was able to pull over, they removed the kids from the van and opened all the doors to air it out. He testified his girlfriend, Crystal, was covered in the powder from the neck down.

12

The Condition

Rios testified the following day he began experiencing "a soreness or an itchiness in the nostrils and the throat area" and later that same evening went to the emergency room. However, he later clarified he went to the hospital at approximately 11:30 p.m. on January 31, 2013; the incident occurred on January 28, 2013. He stated he went to the emergency room because he was having irritation in his throat and his breathing was not good. Medical records from that visit state, "Patient complaining of difficulty breathing and swelling to throat area onset two days ago after inhaling powder from a fire extinguisher." He recalled reporting that information to medical providers. During the same hospital visit, early in the morning of February 1, 2013, a doctor's note states Rios "[w]as accidentally exposed to fire extinguisher material, inhaled it, has had sore throat, cough, and shortness of breath since. Throat pain worse with cough." The records denote the impression and plan, "Chemical exposure and pneumonitis. Reactive airway exacerbation." Rios testified he received oxygen therapy during his first visit, and confirmed he had some throat pain, but his condition improved. Upon discharge, he received educational materials on asthma, acute bronchospasm, and inhalation injury. He was discharged shortly after 7:00 a.m. on February 1, approximately eight hours after his arrival.

Among the educational materials received by Rios and made part of his medical records was a document on inhalation injuries. It stated:

> Your exam shows you have suffered an inhalation injury. This is common after exposure to smoke or vapors of toxic chemicals which irritate the airway. Symptoms of an inhalation injury include cough, chest pain, and shortness of breath. Sometimes toxic inhalation symptoms can be delayed for up to 24 hours after exposure. Most of the time symptoms are much improved within 1-2 days.
>
> .             .             .
>
> SEEK IMMEDIATE MEDICAL CARE IF YOU EXPERIENCE: Increasing shortness of breath or wheezing[;] [p]ersistent cough or coughing up blood or dark

13

material[;] [c]hest pain, fever, or severe weakness[; or a] fainting episode.

The evidence shows after Rios was discharged from his first hospital visit the morning of February 1, 2013, he returned to the emergency room the same day at approximately 8:00 p.m. complaining of shortness of breath. He testified he was again feeling "irritation and shortness of breath." The medical records from the second visit state, "[Rios] said that five days ago he inhaled powder from a fire extinguisher in his car." Rios recalled telling hospital employees at the second visit about the incident with the fire extinguisher. The medical records note Rios was experiencing "[i]nspiratory and expiratory wheez[ing]" as well as thick yellow phlegm. The records also state, "Patient states he feels throat swelling and difficulty speaking." Another record from the second hospitalization indicates:

> This patient was seen here yesterday for sore throat. Apparently he had accidentally been sprayed in the face with a fire extinguisher a few days prior. He was having some hoarseness when speaking and was treated with steroids and sent home. He returns today and his symptoms are much worse. He has to sit up to breathe. . . . He is able to swallow, but it is painful. . . . He can only barely phonate. . . . He is having difficulty with inspiration. . . . We have obtained a soft tissue neck X-ray which shows increased prominence in the laryngeal area, which is of unclear significance per radiology.

On February 2, 2013, during Rios's second visit to the hospital, he was intubated. Medical records in evidence show approximately ten minutes after he was intubated, Rios was in respiratory distress. The records continue, "[P]atient with inhalation injury five days ago with progressively worsening dyspnea and laryngeal edema."

Rios was discharged from his second hospital visit on February 8, 2013, a week after he was admitted. His discharge diagnosis was asthma exacerbation, morbid obesity, and type 2 diabetes mellitus. At trial, he testified that he had asthma as a child and sometimes used an inhaler, but had never been hospitalized for asthma as an adult. During his second hospital stay, Rios

14

received treatment for diabetes and was discharged with a prescription for metformin to treat his diabetes.

On February 11, 2013, Rios went to the hospital for a third time complaining of shortness of breath. When he arrived at the hospital, he was unable to speak and pointed to his throat. The notes from this visit state, "Chief complaint[:] Complains of shortness of breath with sudden onset at [10:00 p.m.]. Patient with diminished [breath sounds] to upper lobes bilaterally, denies pain. Patient was discharged from ICU February 8, 2013." A second note entered a short time later indicates, "[Age] 29 morbidly obese male with stridor complains of shortness of breath, recurrent, was recently intubated at UMCEP for similar episode. Related to inhaling fire retardant. Denies exposure today. Exam. Obese inspiratory and stridor."

A few hours later, at 12:45 a.m. on February 12, 2013, Rios's medical records have a doctor's note reading:

> The patient presents with difficult breathing and stridor. The onset was just prior to arrival. The course/duration of symptoms is constant and worsening. Degree at onset moderate. Degree at present moderate. The exacerbating factors is recent intubation. The relieving factors is none. Risk factors consist of obesity. Prior episodes: Occasional. Therapy today: oxygen and emergency medical services.

> .               .               .

> Associated symptoms: Denies chest pain, denies fever, and denies chills. . . . Additional history: 29-year-old obese male presents for evaluation of stridor, dyspnea, and difficulty breathing that occurred just [prior to arrival]. The patient was admitted on February 2nd for laryngeal edema and stridor after chemical pneumonitis after the patient inhaled fire extinguisher fumes. The patient was extubated two days later and diagnosed with diabetes and discharged with inhaler. The patient says that he developed difficulty breathing this afternoon and came immediately to the emergency room.

Rios's records from February 12, 2013 also contain a note from a pulmonologist, which states, "Patient examined by me. I agree with findings above[.] Dyspnea, dysphonia, morbid

15

obesity. . . . Not asthma." Another note states, "This 29-year-old male SP inhalation of chemicals at work. Admitted to the hospital." Rios recalls telling his medical team during the third visit about the incident with the fire extinguisher.

The following day, February 13, 2013, Rios underwent a tracheostomy. The surgical notes state "Preoperative diagnosis: Respiratory failure. Postoperative diagnosis: Respiratory failure. Procedure performed: Open complex tracheostomy. . . . Findings of procedure: It was a simple, converted to complex open trach." The surgical note contains a lengthy, detailed account of the surgery and how the physician performed it.

Rios was discharged from his third hospital visit on February 28, 2013. In his medical records, his discharge diagnosis is, "1. Upper airway obstruction second to Vocal cord dysfunction S/P permanent tracheostomy placement. 2. [Obstructive sleep apnea]. 3. Morbid obesity. 4. UTI. 5. H/O childhood asthma. 6. DM2." The section titled "History of Present Illness" contains the following description:

> This is a 29 years [sic] old gentleman, was recently discharged from the hospital for suspicion of asthma exacerbation. On previous admission, he reports that he had inhaled fumes from the malfunctioned fire extinguisher and he came into the emergency department. He was intubated and then discharged with an impression of asthma exacerbation. At this time, he came in with the same complaint over 3 days history of shortness of breath and wheezing. He denied chills, fever, or headache. The patient had a questionable history of childhood asthma. He was recently diagnosed with diabetes, and he is morbidly obese and he was diagnosed with obstructive sleep apnea.

Among the other notes in his discharge summary was a description of the treatment he received during his third stay. The records describe his intubation and tracheostomy, a failed BiPAP and twice-failed extubation, a permanent tracheostomy placement, and a laryngoscopy with an "[e]ssentially normal pharynx and epiglottis [sic]." The records also describe treatment for a urinary tract infection, or UTI, noting, "During this hospitalization, the patient reports sweating,

16

chills, fever, and urine culture was positive for Klebsiella pneumoniae sensitive to Zosyn. It was treated and was resolved after 7 days." At discharge, he received prescriptions for metformin and albuterol. He also received tracheostomy supplies and other equipment to keep the tracheostomy tube clean.

Analysis

Guardian urges us to find this case analogous to *Guevara*. 247 S.W.3d at 663-64. In that case, Arturo was injured in a car accident. *Id.* at 663. Immediately afterward, he was screaming, complaining of a stomachache, and moaning. *Id.* at 664. Arturo underwent abdominal surgery the night of the accident, and a second surgery when the first surgery failed to heal correctly. *Id.* All the evidence regarding Arturo's condition and treatment was provided by lay testimony from Arturo's daughter. *Id.* at 663. No medical records from his hospitalization nor medical testimony were introduced into evidence. *Id.* at 664. The medical bills, which were admitted into evidence, indicated Arturo was in intensive care from the date immediately following the car accident until approximately two and a half months later, and remained in the hospital for another month. *Id.* After he was discharged from the hospital, Arturo spent another two weeks in a continuing care facility. *Id.* The medical bills introduced into evidence included the bills for the duration of his hospital stay and his care facility confinements, and other "associated expenses for items such as drugs, laboratory procedures, respiratory services, physical therapy, renal dialysis, multiple anesthesia administrations, echo cardiograms, and 'ancillary charges' of various kinds." *Id.* The bills exceeded $1 million. The defendant moved for directed verdict based on the lack of evidence on causation. *Id.* at 664-65. The plaintiff, Arturo's daughter, argued that the "sequence of treatments following the accident combined with lay testimony about the accident and Arturo's

17

having no abdominal problems or requiring a ventilator prior to the accident was sufficient to establish a causal relationship." *Id.* at 665. The motion for directed verdict was denied, and the jury awarded damages over $1.1 million for Arturo's medical expenses, plus $125,000 for pain and mental anguish. *Id.* The defendant filed a motion for judgment notwithstanding the verdict based on the same arguments regarding causation. *Id.* The trial court granted the defendant's motion and entered a take-nothing judgment for the plaintiff, who appealed. *Id.*

Relying primarily on *Morgan*, 675 S.W.2d at 729, the court of appeals found there was legally sufficient evidence of causation. *Guevara*, 247 S.W.3d at 665. Specifically, because "Arturo did not suffer from any of his post-accident injuries prior to the accident," he was not in poor health prior to the accident, and "no great length of time passed between the accident and Arturo's death during which he was not in the hospital or receiving care at home[,]" the court of appeals determined the lay testimony was sufficient to "establish[] a sequence of events which provided a strong, logically traceable connection between the event and the condition so that a layperson could determine, with reasonable probability, there was some evidence of the causal relationship between the event and the condition." *Id.* [Internal quotations and brackets omitted]. For those reasons, the court of appeals reversed the take-nothing judgment and remanded for entry of judgment based on the jury's verdict. *Id.*

On review, the Texas Supreme Court recognized the holding from *Morgan*, previously recounted in this opinion, and acknowledged:

> [T]he basic premise affirmed in *Morgan*: competent evidence is required to prove the existence and nature of a condition and a causal relationship to the event sued on even though, in limited circumstances, the existence and nature of certain basic conditions, proof of a logical sequence of events, and temporal proximity between an occurrence and the conditions can be sufficient to support a jury finding of causation without expert evidence.

*Guevara*, 247 S.W.3d at 667. The Supreme Court noted, however, that "evidence of temporal proximity, that is, closeness in time, between an event and subsequently manifested physical conditions" may be relevant to causation, but unless "combined with other causation evidence, evidence that conditions exhibited themselves or were diagnosed shortly after an event" did no more than "raise[] suspicion that the event at issue caused the conditions." *Id.* at 668 ("[S]urmise or suspicion of the matter to be proved . . . is 'no more than a scintilla and, in legal effect, is no evidence.")(quoting *Ford Motor Co.*, 135 S.W.3d at 601).

In applying these principles to the facts of Arturo's accident and subsequent treatment, the court noted:

> The jury awarded damages for Arturo's treatments which included, among other expenses, the cost of (1) at least two abdominal surgeries; (2) three separate confinements in health care facilities, one of which was for over three months; (3) a great variety and quantity of various pharmaceutical supplies, medicines, and drugs; (4) numerous varied laboratory procedures; (5) extensive treatments for respiratory failure and therapy; (6) physical therapy of various kinds; (7) treatments for kidney failure; and (8) a great assortment and quantity of "central supply" and miscellaneous medical charges.

*Guevara*, 247 S.W.3d at 669. The only evidence identifying the conditions for which Arturo received treatment in the hospital was from the medical history in records from the continuing care facilities. *Id.* They did not diagnose his previous conditions or "relate his conditions to the accident." *Id.* The charges for the various therapies Arturo received did not state which condition the therapy was intended to treat. *Id.* The court stated, "Patients in hospitals are often treated for more than one condition brought on by causes independent of each other. Absent expert proof of the conditions and their causes, judgment for the expense of treatment is not supported by legally sufficient evidence." *Id.* [Internal citation

19

omitted].

Based on its analysis, the court held:

Non-expert evidence of circumstances surrounding the accident and Arturo's complaints is sufficient to allow a layperson of common knowledge and experience to determine that Arturo's immediate post-accident condition which resulted in his being transported to an emergency room and examined in the emergency room were causally related to the accident. Thus, the evidence is legally sufficient to support a finding that some of his medical expenses were causally related to the accident. On the other hand, the evidence is not legally sufficient to prove what the conditions were that generated all the medical expenses or that the accident caused all of the conditions and the expenses for their treatment.

*Guevara*, 247 S.W.3d at 669-70.

Rios asks us to analogize this case to *Morgan*, which involved inhalation of chemical fumes. *Morgan*, 675 S.W.2d at 733. There, only the plaintiff offered testimony on causation, which was that in the days following the installation of a typesetting machine a few inches away from her face at her workstation, she began experiencing watering eyes, blurry vision, headaches, gastrointestinal issues, swelling of her nasal passages, and difficulty breathing. *Id.* It was admitted by default that the typesetting machine was leaking chemical fumes.[1] *Id.* Plaintiff testified she had always been in good health prior to her chemical exposure. *Id.* The Supreme Court found plaintiff's testimony was legally sufficient to support a damages award. *Id.* It held Morgan's testimony regarding her return to work, the timing of onset of her symptoms, and the admitted release of chemical fumes from the typesetting machine "establishes a sequence of events from which the trier of fact may properly infer, without the aid of expert medical testimony," that Compugraphic's negligence caused Morgan's injuries. *Id.*

---

[1] *Morgan* involved the sufficiency of evidence to support damages in a default judgment proceeding; the liability of the defendant, including the allegation that the typesetting machine was leaking fumes, was admitted as a result of the defendant's default. *Morgan*, 675 S.W.2d at 730, 732-33.

We recognize the similarity of the nature of the incident in *Morgan* and in the case before us—namely, the inhalation of fumes. We also recognize some similarities between the respiratory injuries Rios experienced and those Morgan experienced after being exposed to the fumes, such as the swelling of breathing passages and difficulty breathing. Morgan was, according to the evidence admitted by default, exposed to the leaking fumes all day at work for approximately a month before the leaks were repaired. *Morgan*, 675 S.W.2d at 731. Her subsequent health issues began a few days after her initial exposure, and she had previously been in good health. *Id.* at 731, 733. Similarly, the evidence adduced at trial in this case demonstrates Rios's first trip to the emergency room to obtain treatment for a sore and itchy throat and shortness of breath, which he testified had onset the day after the incident and worsened until he arrived at the hospital on January 31, 2013, presents a logical series of events connecting the inhalation of the fire extinguisher fumes to his symptoms. Although his first arrival to the hospital was three days after the incident, Rios testified his conditions began the day after the incident and gradually worsened until he made his first visit to the hospital. This timeline of symptoms logically follows from the fire extinguisher event. Additionally, the timing of the second and third hospitalizations in which Rios initially presented with shortness of breath continue the logical sequence of events which the jury could reasonably infer resulted from the inhalation of fire extinguisher fumes without the need for expert medical testimony. *See id.* at 733. Rios testified although he received treatment for asthma as a child, he had never previously been hospitalized for asthma or difficulty breathing and had not required medical treatment for his asthma since childhood. We therefore find the evidence regarding Guardian's complaints of respiratory illness in the days and weeks following the incident demonstrate a sequence of events providing a strong, logically traceable connection between the

21

fire extinguisher incident and his subsequent respiratory problems. *Id.*

However, the logical sequence of events ends with the Rios's discharge from his third hospitalization at University Medical Center on February 28, 2013. The evidence regarding Rios's treatment after his February 28, 2013 hospital discharge lacks a sufficient logical sequence ascertainable from either a reading of the medical records or Rios's negligible testimony regarding it. Furthermore, it lacks the temporal proximity element present in the evidence regarding the three hospitalizations. This gap in the timeline cuts off the sequence shown in Rios's previous treatment. Accordingly, any condition for which Rios sought treatment after his February 28, 2013 discharge from University Medical Center required expert medical testimony to link it to the events of January 28, 2013. Without expert testimony, the evidence was legally insufficient to support a jury finding that any condition which occurred after that time was proximately caused by the fire extinguisher incident.

**The Nature of the Physical Conditions Complained Of**

Having determined Rios's testimony demonstrated a "sequence of events" showing "a strong, logically traceable connection" between the incident and Rios's hospitalizations for respiratory complaints, we now consider whether the evidence showed the physical conditions Rios complained of "(1) are within the common knowledge and experience of laypersons, (2) did not exist before the incident, (3) appeared after and close in time to the [incident], and (4) are within the common knowledge and experience of laypersons, caused by [the incident]." *Guevara*, 247 S.W.3d at 667.

We first look at whether the conditions existed before the incident and whether they appeared shortly after the incident. *Id.* at 667. Rios testified that before the incident on January 28,

22

2013, he had never gone to the emergency room because he could not breathe, nor had he ever inhaled fire extinguisher powder before. He also testified he had never previously been hospitalized for asthma or received treatment for asthma as an adult. Rios testified he first began experiencing symptoms of shortness of breath and a scratchy, sore throat the day following the fire extinguisher incident. From the time of onset, his symptoms worsened until his first hospitalization, then improved with the treatment he received in the hospital, and then dramatically declined after he was released from his first hospitalization. Similarly, after being hospitalized for a week during his second hospitalization, Rios's condition improved enough for him to breathe on his own and be discharged. However, within a few days, he was again feeling severe shortness of breath and tightening of his throat, requiring the third hospitalization. His difficulty breathing occurred within the month following the accident, beginning the day after the accident, and had not existed prior to the incident since his childhood asthma many years before. Taking the evidence in the light most favorable to the verdict, it appears the respiratory conditions did not exist before the incident and they appeared after and in close time to the incident's occurrence.

Next, we inquire whether the conditions themselves are within a layperson's common knowledge and experience, and if a layperson's common knowledge and experience links the conditions as having been caused by the incident. Rios's initial symptoms—shortness of breath, coughing, sore and scratchy throat—which precipitated his first hospital visit are all conditions within a layperson's common knowledge and experience. Additionally, his later hospitalizations for respiratory distress included many of the same initial complaints regarding difficulty breathing, a sore throat, and swollen airways. He also complained of difficulty swallowing from his swollen throat, wheezing, and thick phlegm. Like the symptoms experienced by the plaintiff in *Morgan*,

23

these are the types of conditions about which a lay person has knowledge and expert testimony is not necessary to explain. 675 S.W.2d at 733. Further, while we are reluctant to say that inhaling fumes from a fire extinguisher is so common of an incident that the average layperson has experienced it, inhaling fumes of some kind—whether chemical, smoke, a fine powder, or otherwise—is certainly within a layperson's general knowledge and experience. Similarly, common respiratory effects of inhaling fumes, like shortness of breath, a dry and scratchy throat, or tightened airways, are also within a layperson's common knowledge and experience. Thus, we find it is reasonable to expect a layperson, based on their common knowledge and experience, both understands conditions common in respiratory irritation and distress like those Rios experienced, and that inhalation of chemical fumes from a fire extinguisher probably caused those conditions.

However, some conditions for which Rios was diagnosed and received treatment one could speculate are respiratory and could have been caused or exacerbated by the incident. However, these facts lie outside of common knowledge or experience in which lay testimony could be considered adequate. The medical records diagnose Rios with dyspnea, laryngeal edema, and stridor, which are medical terms whose definitions are not commonly known by a layperson, and which a layperson would not typically know involve respiratory illness. Although they are mentioned alongside other more common respiratory conditions, whether they are in fact conditions involving respiratory distress and were the result of inhalation of fire extinguisher fumes is not something about which a layperson would have knowledge. Accordingly, we cannot find that lay testimony alone would adequately describe them to a jury. And here, Rios made no effort to explain these diagnoses or whether they were caused by the incident.

Additionally, doctors treated and diagnosed Rios with several chronic health ailments in

24

his second and third hospital visits which Rios explicitly denied were the result of the fire extinguisher incident, such as diabetes mellitus type 2, obstructive sleep apnea, and morbid obesity. Like the injured person in *Guevara*, Rios was treated for the chronic health issues during his second and third hospitalizations contemporaneously with the treatment he received for his respiratory problems. Rios's medical records indicate he also received treatment for other health issues during his hospitalizations, such as a UTI. A lay person cannot draw a logical link between these conditions as having been caused by the incident based on their general knowledge and experience.

Based on the standard enumerated in *Guevara*, we find lay testimony alone is legally sufficient to support a finding that some of the respiratory conditions Rios received treatment for during his three hospitalizations were proximately caused by the fire extinguisher incident. However, we find expert testimony was required to prove the fire extinguisher incident proximately caused (1) any condition for which Rios received treatment during his three hospitalizations, other than those commonly known to relate to respiratory distress, and (2) any treatment occurring after Rios's February 28, 2013 discharge.

Guardian's first issue is sustained in part.

### Issue Two: Lay Testimony to Support Damages

Having determined the evidence is legally sufficient to prove some, but not all, conditions for which Rios sought treatment, we now consider Guardian's second issue: whether expert medical testimony was required to establish which medical expenses awarded to Rios by the jury were attributable to the incident with the fire extinguisher.

In *Texarkana Memorial Hosp., Inc. v. Murdock*, a newborn baby born with significant birth

25

defects aspirated meconium during the birth. 946 S.W.2d 836, 837 (Tex. 1997). He received treatment for the aspirated meconium for several weeks following his birth and was discharged. *Id.* He was readmitted twice thereafter and ultimately died shortly after his first birthday. *Id.* His mother sued the hospital for medical negligence arising out of their treatment of her son following the meconium aspiration. *Id.* At trial, the medical records and medical testimony indicated the baby received treatment for other health issues, including his numerous birth defects, contemporaneously with his treatment for meconium aspiration. *Id.* at 838-39. Only the hospital's negligence in treating the baby's aspiration of meconium was at issue, but the evidence indicated the baby received treatment for other ailments while at the hospital. *Id.* at 840. There was no evidence segregating the medical expenses for treating the conditions caused by the meconium aspiration. *Id.* The Supreme Court stated,

> There was more than one condition to be treated, each produced by an independent cause, and sufficient evidence to indicate that treatment for more than one condition occurred. Therefore, it was incumbent upon the plaintiffs to prove which treatments were due to meconium aspiration and its effects, and the specific costs associated with those treatments sufficient to support a jury award of $500,000 for medical expenses. Because they failed to do so, we must reverse.
>
> .     .     .
>
> There is no testimony . . . that links any dollar amount of the medical expenses charged by [the hospital] with treatment of conditions caused by [their physician]. A lay jury cannot be expected to ascertain without guidance from a medical expert which treatment was for meconium aspiration and its effects, and the costs associated with that treatment upon which it could base an award for medical expenses due to [the physician's] negligence.

*Id.* at 840-41 [Internal citations omitted].

We consider this issue as part and parcel with Guardian's first issue. Rios submitted medical bills from four different providers spanning a date range of January 31, 2013 to July 13, 2015. We previously determined lay testimony is legally insufficient to prove causation for any

condition after Rios's third hospitalization, which ended on February 28, 2013. Accordingly, any damages awarded to Rios for treatment he received after his hospital discharge on February 28, 2013, are not supported by legally sufficient evidence. In addition, the medical bills admitted into evidence for Rios's second and third hospitalizations do not specify to which conditions the various charges relate or whether such conditions are causally linked to the fire extinguisher incident. Presenting evidence of a causal link was Rios's burden as the plaintiff. *Murdock*, 946 S.W.2d at 840; *see also Guevara*, 247 S.W.3d at 669 ("Patients in hospitals are often treated for more than one condition brought on by causes independent of each other. Absent expert proof of the conditions and their causes, judgment for the expense of treatment is not supported by legally sufficient evidence.")[Internal citation omitted].

We also determined the evidence was legally insufficient to support the jury's finding on causation as it relates to some of Rios's treatment during his hospitalizations, and Rios made the same admission at trial. Nevertheless, Rios requested, and the jury awarded, the full balance of medical bills charged by University Medical Center for Rios's three hospitalizations, despite admitting he received treatment for conditions which were not caused by the incident. The jury also awarded balances owed to other providers for treatment that occurred months or years after the third hospitalization for which there was legally insufficient evidence of causation. It is axiomatic that some portion of the jury's damages award was not supported by legally sufficient evidence.

We therefore find the evidence is legally sufficient to support a past medical damages award for some of Rios's medical treatment for respiratory illness caused by the fire extinguisher incident based solely on lay testimony. However, we find expert testimony was required to prove

27

the fire extinguisher incident proximately caused past medical expense damages for treatment Rios received during his three hospitalizations. However, those past medical expense damages relating to respiratory distress, and any medical treatment occurring after Rios's February 28, 2013 discharge from University Medical Center should be excluded.

Guardian's second issue is sustained in part.

### *Disposition*

We find the evidence legally insufficient to support the jury's finding the fire extinguisher incident caused all the medical expenses awarded by the jury and reflected in the trial court's judgment. We must therefore reverse the trial court's judgment. *Guevara*, 247 S.W.3d at 669.

Although sustaining a no-evidence issue on appeal typically results in a judgment rendered for the Guardian, such is not the case when there is evidence supporting some damages. *Guevara*, 247 S.W.3d at 670. Based on the guidance provided in *Guevara*, appropriate disposition of this case requires either a suggestion of remittitur, if determinable, or a remand for new trial. *Id.* at 669; *see also Tony Gullo Motors I, L.P. v. Chapa*, 212 S.W.3d 299, 310 (Tex. 2006)(determination of remittitur was appropriate where amount of attorney's fees recoverable could easily be segregated from total amount of attorney's fees sought); *Minn. Mining & Mfg. Co. v. Nishika Ltd.*, 953 S.W.2d 733, 739-40 (Tex.1997)(remand for new trial was appropriate when legally sufficient evidence supports an unsegregated damages award).

The medical bills admitted into evidence for Rios's three hospitalizations do not segregate charges for respiratory care and those for other care, or indicate whether the charges are causally linked to the fire extinguisher incident. Presenting evidence of the causal link between a medical expense and the incident was Rios's burden as the plaintiff. *Murdock*, 946 S.W.2d at 840. We find

28

it highly improbable a jury could determine with reasonable accuracy which medical charges correspond to treatment for Rios's respiratory problems without the assistance of a medical expert. *See id.* at 841. This Court finds itself in the same unfortunate position; as laypersons in the field of medicine; we lack the scientific knowledge necessary to segregate the charges supported by legally sufficient evidence so a suggestion of remittitur can be made. However, Rios provided evidence of actual damages for the entirety of his hospital admissions, which constitutes more than a scintilla of evidence of actual damages for treatment of only those conditions proximately caused by the fire extinguisher incident. *See id.* For this reason, he should be given an opportunity to develop this evidence further. *See id.*

Consistent with precedent on this issue,[2] remand to the trial court for new trial is necessary and appropriate. Throughout the course of litigation and the trial, Guardian disputed its liability for causing the injuries sustained by Rios, and it maintains that position on appeal. Where liability issues are contested, a separate trial on unliquidated damages alone is improper. *Minn. Mining*, 953 S.W.2d at 740. Rather, a new trial on both liability and damages is necessary under the circumstances. *Id.*

## CONCLUSION

Because the evidence is legally insufficient to support the jury's finding the fire extinguisher incident caused all the medical expenses the jury awarded to Rios, we reverse the judgment of the trial court. *Guevara*, 247 S.W.3d at 670; *Murdock*, 946 S.W.2d at 841. However, because there is evidence to support some damages—specifically, damages for respiratory illness treated between January 28, 2013 and February 28, 2013—we remand the case to the trial court

---

[2] *Murdock*, 946 S.W.2d at 841; *Minn. Mining*, 953 S.W.2d at 739-40; *Stewart Title Guar. Co. v. Sterling*, 822 S.W.2d 1, 10-12 (Tex. 1991).

for new trial on liability and damages consistent with this opinion. *Guevara*, 247 S.W.3d at 670;

*Murdock*, 946 S.W.2d at 841; *Minn. Mining*, 953 S.W.2d at 740.

July 27, 2022                                           YVONNE RODRIGUEZ, Chief Justice

Before Rodriguez, C.J., Palafox and Alley, JJ.